J-A10044-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF D.P., | : | IN THE SUPERIOR COURT OF |
| MINOR CHILD | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: M.H., MOTHER | : | No. 1650 WDA 2015 |

Appeal from the Order September 18, 2015
In the Court of Common Pleas of Washington County
Orphans' Court at No(s): 63-15-0176

BEFORE:  GANTMAN, P.J., BENDER, P.J.E., and PANELLA, J.

MEMORANDUM BY GANTMAN, P.J.:                    **FILED JUNE 09, 2016**

Appellant, M.H. ("Mother"), appeals from the order entered in the Washington County Court of Common Pleas, which granted the petition of the Washington County Children & Youth Services Agency ("CYS") for involuntary termination of Mother's parental rights to her minor child, D.P. ("Child").[1]  We affirm.

In its opinions, the trial court fully and correctly set forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.[2]

Mother raises two issues for our review:

---

[1] D.P. ("Father") also appeals from the order which granted involuntary termination of his parental rights to Child, at docket No. 1615 WDA 2015.

[2] We add only that the court granted CYS' petition for involuntary termination of Mother's parental rights under 23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5), and (b), on September 18, 2015.  On Monday, October 19, 2015, Mother timely filed a notice of appeal along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).

> WHETHER, BASED UPON THE EVIDENCE PRESENTED AT THE TIME OF THE TRIAL, THE COURT ERRED IN TERMINATING [MOTHER'S] PARENTAL RIGHTS PURSUANT TO SECTIONS 2511(A)(1) AND (2) OF THE ADOPTION ACT, WHEN MOTHER COULD BE EXPECTED TO REMEDY THE ISSUES AND CIRCUMSTANCES WHICH [NECESSITATED] PLACEMENT WITHIN A REASONABLE PERIOD OF TIME?
>
> WHETHER THE TRIAL COURT ERRED IN FINDING THAT THE TERMINATION OF [MOTHER'S] PARENTAL RIGHTS SERVED CHILD'S NEEDS AND WELFARE WHEN TESTIMONY ESTABLISHED THAT A CLOSE BOND EXISTED AND THAT DETRIMENTAL HARM WOULD BE SUFFERED IF THE BOND WOULD BE SEVERED.

(Mother's Brief at 4).[3]

After a thorough review of the record, the briefs of the parties, the applicable law, and the comprehensive opinion of the Honorable Michael J. Lucas, we conclude Mother's issues merit no relief. The trial court opinions discuss and properly dispose of the questions presented. (**See** Findings of Fact, Conclusions of Law and Order, filed September 18, 2015, at 10-11; Trial Court Opinion, filed November 23, 2015, at 14-20) (finding: in 2014, Mother pled guilty in West Virginia to charges relating to endangerment of Child; Mother remained incarcerated at time of termination hearing and had not yet begun services in compliance with permanency plan; at time of termination hearing, Mother's release date was between July 2015 and June 2016; Child had been in placement for twenty-two of last thirty-two months at time of hearing; evidence showed Mother made little progress since

---

[3] Mother does not challenge the court's termination of her parental rights under 23 Pa.C.S.A. § 2511(a)(5).

- 2 -

Child's initial placement with CYS in 2012; Mother also made no progress at alleviating circumstances which led to Child's second placement in 2014; conditions which twice necessitated Child's placement continue to exist, and Mother presented no reliable or persuasive evidence to demonstrate that she can or will remedy those conditions within reasonable period of time; CYS caseworker credibly testified Mother's contact with Child was limited during her incarceration, consisting of "sporadic" phone calls when Mother had "money on the books," and gifts of candy;[4] from time of incarceration until termination hearing, Mother provided no financial support for Child; CYS caseworker expressed concern that if Child were returned to care of his parents, Child would encounter difficulties due to unhealthy relationship between Mother and Father; CYS caseworker testified involuntary termination of Mother's parental rights will serve Child's best interests and need for permanency; Child is doing well in Paternal Grandmother's home and Paternal Grandmother wants to adopt Child; although Child has some bond with Mother, that bond is not beneficial; CYS met its burden for involuntary termination of Mother's parental rights under Section 2511(a)(1), (a)(2), (a)(5), and (b)).[5]  Accordingly, we affirm on the basis of

---

[4] Paternal Grandmother testified Mother also sent Child cards occasionally.

[5]  Mother complains the court should not have considered Paternal Grandmother's testimony that she would permit continuing contact between Mother and Child upon termination of Mother's parental rights.  Mother failed to raise this claim in her Rule 1925(a)(2)(i) statement, so it is waived.  ***See Commonwealth v. Castillo***, 585 Pa. 395, 888 A.2d 775 (2005) (holding

the trial court's opinions.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

DATE: 6/9/2016

_____

generally that any issues not raised in Rule 1925 concise statement will be deemed waived on appeal); **In re L.M.**, 923 A.2d 505 (Pa.Super. 2007) (explaining waiver rules under Rule 1925 apply in context of family law cases).

IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY,
PENNSYLVANIA
ORPHANS COURT DIVISION

IN THE INTEREST OF

D. P.                                    Case No. 63-15-0176

2015 SEP 18 PH 1:54
REGISTER OF WILLS
WASHINGTON CO. PA
REGISTERED DATE

Minor Child

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND

## ORDER

1. On February 11, 2015 the Agency filed a petition to involuntarily terminate the parental rights of m·H. ("mother") and D.P. ("Father").

2. mother and Father are the biological parents of D·P. ("Child")a four (4) year old boy, born in , 2010.

3. Service of the petition was effectuated by certified mail with a return receipt signed by Father on March 16, 2015 and by a restricted mail service upon mother while she was incarcerated at the Washington County Correctional Facility.

4. The procedural record of dependency proceedings at docket number DP 184-2012 indicates that child was first adjudicated a dependent child on September 14, 2012.

5. The Honorable John F. DiSalle found child to be dependent based upon testimony that mother left child, then less than 2 years old, unaccompanied in a vehicle while she went into a grocery store. Caseworker Henry went to the family home that day and observed mother to be erratic, agitated and unable to focus. Mother could not change child' 's diaper and requested father 's assistance. A domestic argument then ensued. Mother refused a drug test and father tested positive for benzodiazepines. Later that same day, father called the police and requested that mother be involuntarily committed. During this visit, Caseworker Henry observed child to be "dirty."

6. Judge DiSalle also credited testimony of Caseworker Reynolds who stated that mother previously had her parental rights for another child terminated on May 31, 2010. Caseworker Reynolds indicated mother had a "lengthy drug history including consumption of cocaine and opiates. At the time of the initial adjudication hearing, mother was prescribed Suboxone, Subutex and Lamictal. Mother acknowledged she was under the care of a psychiatrist, Dr. Shahoud, and received treatment from

Western Behavioral Health. Judge DiSalle placed Child in a kinship placement. Judge DiSalle found aggravating circumstances regarding Mother but did not excuse the Agency from exercising reasonable efforts to reunify Child with Mother.

7. On November 16, 2012, an initial permanency review hearing was held. The findings from the proceeding indicate that Father had completed mental health and a drug and alcohol evaluation. Dr. Rodney Williams determined that Father suffered from opiate dependence. Father began counseling and was prescribed both Subutex and Suboxone. Dr. Williams also evaluated Mother. Dr. Williams diagnosed Mother as suffering from Bipolar disorder and opiate dependence. N.P., a paternal aunt, and the placement provider, testified that both Mother and Father appeared "high" when visiting with Child.

8. On February 15, 2013 Master Roberts conducted another permanency review hearing. Master Roberts noted the progress both Mother and Father had made in treatment, but recommended continued placement and supervised visits. The Honorable Katherine B. Emery accepted the recommendation.

9. Further permanency review hearings were held on March 15, 2013, May 10, 2015 August 26, 2013 and November 12, 2013. On August 26, 2013 Judge

Emery returned Child to the home of Father. Judge Emery found on November 12, 2013 that Child was safe in his father's care and that Mother should have supervised visits.

10. On May 3, 2014 the Agency petitioned this court to terminate dependency and represented that Child was safe and doing well.

11. Within less than two (2) months, this court conducted another merit hearing as a result of a newly filed petition alleging Child's dependency. At the time of the hearing, both Mother and Father were incarcerated in West Virginia due to an incident on June 16, 2014. Specifically, this court found both were arrested due to their intoxication while in a moving vehicle with Child. As both were incarcerated, Child had no parental control, care or supervision. This court directed that Child be placed in the care of his paternal grandmother, P. P. . The Court directed that both Mother and Father have mental health and drug and alcohol evaluations. Further, both were directed to complete parenting education.

12. On September 29, 2014, December 29, 2014 and March 23, 2015 Master Roberts conducted permanency review hearings. With regard to Mother, Master Roberts consistently found no compliance with the permanency plan and no progress towards eliminating the circumstances that required placement. For Father, Master Roberts had similar findings in

the first two hearings. However, on March 23, 2014, after the Agency filed a petition to terminate parental rights, Master Roberts found that Father had substantially complied with the child permanency plan and had made substantial progress.

13 Mother has been convicted in Washington County, Pennsylvania of Hindering Apprehension; Criminal Mischief; Recklessly Endangering Another Person; Possession of a Controlled Substance; Driving Under the Influence and Driving under Suspension (DUI Related). Father served six months in jail in West Virginia on charges related to the June 16, 2014 incident. At the time of trial, Father remained subject to parole. According to the testimony of both Father and Mother, each was convicted in West Virginia of endangering the welfare of Child. Both admitted to entering guilty pleas on such charges.

14. Upon release from prison, Father did not return to his mother's home but resided with his brother in Washington, Pennsylvania. Father, however, was granted liberal supervised visitation in his mother's home with Child. Master Roberts specifically recommended and this court ordered that mother could not be present for such visitation. mother was granted supervised visitation at the Washington County Correctional Facility.

15. Testimony at the termination hearing from Caseworker Lindsay indicated that Child is doing well in the home of his paternal grandmother. Ms. Lindsay testified that P.P.'s home is "home" for Child. P.P. is a pre-adoptive resource who is also willing to serve as a permanent legal custodian for Child. Ms. Lindsay testified that P.P. is willing to enter into a voluntary agreement for continuing contact with both parents. See 23 Pa.C.S.A. § 2731, et. seq.

16. Ms. Lindsay credibly testified that after both Father and Mother were incarcerated in West Virginia, their contact with Child was limited. Mother sent no cards, letters or gifts to Child. Father "sporadically" called Child when Father had "money on his books." According to Ms. Lindsay, Child would get upset when talking with his father. From the time of their incarceration to the date of the hearing, Father and Mother provided no financial support for Child.

17. At the time of the hearing, Child had been in an out of home placement for 22 of the last 32 months.

18. Ms. Lindsay acknowledged that Child has a "bond" with both of his parents. Ms. Lindsay indicated that such bond will continue because P.P. is committed to permitting contact between Child and his birth parents.

19. P.P. credibly indicated to the court that she was willing to permit ongoing contact but would not permit mother to be in her home because mother is "violent." Specifically, mother assaulted P.P. and mother burned Father's vehicle. mother, herself, admitted to burning Father's vehicle approximately "two years ago."

20. Bradley Poland, a Try Again Homes caseworker, testified regarding the interaction of each parent with Child. Mr. Poland has observed and supervised each parent with Child. With regard to mother, Mr. Poland testified that Child appeared to like the visits, though Child would not discuss the visits. In contrast, Child always mentioned his visits with his father and was excited to see his father. Father credibly testified that when he visits Child in the home of P.P., he will wait until Child falls asleep to leave so as not to upset Child by his departure.

21. Ms. Lindsay stated that Child needs permanency and his interests are best served by termination and adoption by his paternal grandmother. Ms. Lindsay expressed sincere concern that if Child were returned to his parents he would encounter difficulties due to the unhealthy relationship mother and Father have. Father corroborated this testimony and indicated "Me and mother can't be together again."

22. At the time of trial, Father indicated he was participating in drug and alcohol counseling, a 12 step program, mental health treatment, and grief counseling concerning the loss of his daughter. Father described long-term use of Oxycontin dating back to 1999. He admitted to abusing Xanax. At the time of trial, Mother remained incarcerated and had not begun services in compliance with the permanency plan.

23. After weighing the testimony presented, the Court finds the agency has proven grounds for termination of parental rights by clear and convincing evidence.

24. Specifically, for a period of six (6) months immediately preceding the filing of the termination petition both parents failed to perform parental duties and Child had to be removed from their care by court order for a period in excess of six (6) months.

25. The conditions that led to Child 's removal continue to exist. No reliable and persuasive evidence was presented demonstrating that the conditions that led to Child's removal will be remedied by either parent, within a reasonable period of time. Specifically, Child has been out of his parent's care in 22 of the 32 months leading up to the termination proceeding.

26. Further, both parties' repeated and continued incapacity has caused Child to be without parental care, control or subsistence necessary for his physical

and mental well-being. The court finds that with regard to Mother —there is no credible evidence that the causes of such parental incapacity will be remedied. With regard Father, the court finds credible evidence that his parental incapacity may be remedied. Specifically, at the March 23, 2015 permanency review hearing, Master Roberts found Father to be in substantial compliance with the child permanency plan and to have made substantial progress towards alleviating the circumstances that necessitated original placement.

27. After weighing the testimony presented, the Court finds that a bond does exist between Child and both parents.

28. After weighing the testimony presented, the Court finds that the bond between Child and Father can be a beneficial one to Child. However, despite the Agency's reasonable efforts Father has not maintained a safe and stable home for Child. Twenty two of the thirty two months prior to trial child was in court ordered placement. Further, the credible evidence of record indicates that P.P. is willing to enter a voluntary agreement for continuing contact. The Court finds that severing the bond with Father will not cause irreparable harm to Child because P.P. will permit ongoing contact with Father to the extent such is safe and appropriate for Child.

29. After weighing the testimony presented, the Court finds that the bond between Child and mother is not a beneficial to Child and should not be preserved. The court finds that such bond can be severed without irreparably harming Child:

## Conclusions of Law:

1. Pursuant to 23 Pa.C.S.A. § 2511 (a)(1), (2) and (5) clear and convincing evidence was presented to terminate the parental rights of Mother.

2. Pursuant to 23 Pa.C.S.A. § 2511 (a)(1) clear and convincing evidence was presented to terminate the parental rights of Father.

3. The developmental, physical and emotional needs and welfare of Child require that his bond with Mother be severed. "…A child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa.Super.2003).

4. The developmental, physical and emotional needs and welfare of Child require that his bond with Father be severed. When a Child is placed in foster care, after reasonable efforts have been made to reestablish the

biological relationship, the needs and welfare of the child require CYS and foster care institutions to work toward termination of parental rights, placing the child with adoptive parents. **It is contemplated this process realistically should be completed within 18 months.** *In re G.P.–R.,* 851 A.2d 967, 975–76 (Pa.Super.2004) (quoting *In re B.L.L.,* 787 A.2d 1007, 1016 (Pa.Super.2001)) (emphasis added). Essentially, this legislation shifted away from an "inappropriate focus on protecting the rights of parents" to the priority of the "safety, permanency and well-being" of the child. *In re C.B.,* 861 A.2d 287, 295 (Pa.Super.2004), *appeal denied,* 582 Pa. 692, 871 A.2d 187 (2005). "While this 18–month time frame may in some circumstances seem short, it is based on the policy that a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re N.C.,* 909 A.2d 818, 824 (internal citations and quotation marks omitted). In re R.M.G., 2010 PA Super 103, ¶ 24, 997 A.2d 339, 349 (Pa. Super. Ct. 2010).

63-15-0176

REGISTERED DATE
2015 SEP 18 PM 2:36
REGISTER OF WILLS
WASHINGTON CO. PA

## ORDER

AND NOW, this 18TH day of September, 2015 following trial and review of

written arguments submitted by the parties, the Court grants the petition of the

Agency to terminate the parental rights of: Mother and Father

to the minor child, D . P. The Agency proved by clear and

convincing evidence statutory grounds for involuntary termination. Further, the

evidence, taken as a whole demonstrated that termination of parental rights will

best serve the developmental, physical, and emotional needs of the child.

BY THE COURT

_____ J.

MICHAEL J. LUCAS

IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY, PENNSYLVANIA

ORPHAN'S COURT DIVISION

- - -

In re: Adoption of

D.P.,                                          CP-63-OC-2015-0176
                                               1615 WDA 2015
A minor child,                                 1650 WDA 2015
Appeals of D.P. and M.H., parents.

### Pa.R.A.P. 1925 Memorandum

The Court provides its opinion pursuant to Pa. R.A.P. 1925(A)(2)(ii).

Appellants D.P. ("Father") and M.H. ("Mother") challenge this Court's September

18, 2015 Order terminating their parental rights.

### Procedural History

### I.    First Placement

In September of 2012, the Washington County Children & Youth Services

Agency ("The Agency") received a report that Mother, M.H., left D.P., her minor

child, unattended in a car without license plates while she shopped for groceries,

that the child was unsecured in the vehicle, and that mother urinated on the floor of

the grocery store. Agency Caseworker Christal Reynolds filed a Dependency

Petition on September 11, 2012. In addition to this report, she indicated that she

had visited the home of the parents. As part of this home visit, Mother was unable

20.

to change the child's diaper without assistance, she appeared unable to focus on tasks, and she refused a drug test. Father tested positive for benzodiazepines at the home visit, and later provided a prescription for such from recent dental work. Father, who did not have a valid driver's license, would not permit Mother to drive his car due to his concerns about her medication and drug usage.

Juvenile Hearing Office Jessica Roberts held a merit hearing on September 14, 2012. After hearing testimony from the parents, a paternal aunt, and the Agency Caseworker, she recommended that D.P. be found a dependent child under 42 Pa.C.S. § 6302(1), in that he was a child without parental care, custody, or control. She recommended this on the basis that both Mother and Father were abusing prescription drugs and/or narcotics, Mother was suffering from mental illness, and the home and D.P. appeared unclean. Furthermore, Ms. Reynolds testified at the hearing that M.H. had a "lengthy drug history including consumption of cocaine and opiates", a mental health diagnosis of bipolar disorder, and had a criminal history. The Honorable John F. DiSalle approved this recommendation.

Hearing Officer Roberts also found aggravating circumstances pursuant to 42 P.S. § 6302. On May 31, 2010, the Court involuntarily terminated M.H.'s parental rights to her child T.H. On that basis, Ms. Roberts recommended aggravated circumstances be found to exist, but she did not excuse the Agency

2

from making reasonable efforts to reunify the family. She ordered both parents to undergo drug and alcohol evaluations and to partake in a parenting education program. She also ordered Mother to continue with her mental health therapy. Finally, Ms. Roberts ordered D.P. placed with his paternal aunt and uncle, N·P. and R.P.

Ms. Roberts held the initial permanency review hearing on November 16, 2012. All parties attended. At that time, the parties stipulated to a finding of continuing dependency. Paternal Aunt N·P. testified that she believed both Mother and Father to be under the influence during their periods of supervised visitation. She also testified that she witnessed them argue with each other during visitation. Prior to the hearing, Father underwent a drug and alcohol evaluation, which returned a diagnosis of opiate dependence. Ms. Roberts reported he was taking Suboxone and Subutex, a treatment for opiate withdrawal, and pursuing therapy. Mother also completed her evaluations and received a diagnosis of bipolar I disorder and opiate dependence. She was also prescribed Suboxone and Subutex, as well as Lamictal, a drug for mood stabilization. Mother was also taking part in therapy. Both parents were participating in parenting education courses. Ms. Roberts ordered continued services and visitation, but ordered that visitation would be moved to Try-Again Homes should any further issues occur with the parents at N.P.'s home.

3

Ms. Roberts held a Permanency Review Hearing on February 15, 2013. All parties attended. The parties again stipulated to a finding of continued dependency. At that hearing, no issues were reported regarding visitation, and both parents had passed Agency drug tests. Ms. Roberts reported that both parents were compliant with treatment recommendations, were participating in services, and were completing their parenting education programs. Mother tested positive for methamphetamines, but Ms. Roberts, after hearing significant debate over whether this was a false positive or not, did not make a finding if this constituted drug use. Ms. Roberts increased the parents' visitation and permitted it to take place supervised by the parenting education provider, the Bair Foundation, in the parents' home. She ordered the parents to continue with parenting education through the Bair Foundation, and to continue with drug and mental health treatment.

Ms. Roberts held a further Permanency Review Hearing on March 15, 2013. All parties attended and again stipulated to continuing dependency. The Bair Foundation reported "bizarre behavior" from Mother during supervised visits on March 7 and 9 2013. The Bair Foundation report indicated a concern for her mental health. Ms. Roberts indicated that Father's medical providers reported he had a positive prognosis for recovery.

4

Both parents had completed a segment of their parenting education courses. Mother was drug tested by the Agency on February 15, 21, and 26, 2013. She tested positive for THC and methamphetamine use. Mother presented drug tests by a third party laboratory that indicated she underwent testing on December 10, 2012, January 10, February 4, February 18, March 4, and March 12, 2013 and tested positive only for her prescribed medication. Ms. Roberts did not decrease visitation but ordered both parents to submit to random drug testing at the discretion of the Agency.

Ms. Roberts held a further Permanency Review Hearing on May 10, 2013. Father did not waive his right to have the hearing heard before a Judge, and thus the hearing was continued to August 26, 2013.

At that time, the Honorable Katherine B. Emery conducted a Permanency Review Hearing. All parties attended. Judge Emery found that D.P. remained a dependent child under the care of the Agency, but ordered him to be returned to the home of his father. Judge Emery ordered supervised visitation for Mother for two times per week for a period of four hours each, to be supervised by the Bair Foundation. She further ordered both parties to continue with drug and alcohol services, and to submit to random drug testing, and for Mother to continue with her mental health treatment. Judge Emery also ordered that in addition to his ongoing services, Father was to have no contact with Mother while the child is in his

5

custody. Judge Emery scheduled a Permanency Review Hearing for November 12, 2013.

On November 12, all parties appeared. The parties stipulated to D.P.'s continued dependency. D.P. remained in the care of his father. Judge Emery increased Mother's visitation to three times per week. Judge Emery ordered Mother to continue with her drug, alcohol, and mental health services and drug testing. She did not order services for Father.

On January 29, 2014, the Court permitted the Agency to request termination of court supervision by motion prior to the next Permanency Review Hearing. The Agency presented such a motion on March 3, 2014. At that time, D.P. was in the care of his father and the Agency averred that the child was safe and doing well. The Court granted the motion and terminated supervision.

## II.    Second Placement

The Agency became involved with Mother and Father again on June 3, 2014, after receiving allegations that Father was abusing narcotics. On June 16, 2014, both parents were arrested at a gas station in West Virginia for being intoxicated in a moving vehicle. D.P. was present. Both were incarcerated and D.P. was placed in the case of his paternal grandmother, P. P.    The Agency filed a Petition for Dependency on June 18, 2014.

The Court held a merit hearing on July 1, 2014. At that time, Father, P. P.

, the Agency Solicitor, two agency caseworkers, the Guardian ad Litem Frank C. Kocevar, Esq. and counsel for both parents, Tamora Reese, Esq. and Erick Rigby, Esq. attended. The parties stipulated to this finding of dependency due to the parents' ongoing incarceration in the State of West Virginia. The Court found D.P. to be a dependent child pursuant to 42 Pa.C.S. § 6302(1).

The Court ordered D.P. be placed in kinship foster care with P. P., D.P.'s paternal grandmother. The Court ordered both parents to take part in drug and alcohol evaluations, mental health evaluations, and parenting education programs upon release from incarceration. Both were afforded supervised visitation with D.P., upon release from incarceration, in the home of P. P. The Court assigned the case to Juvenile Hearing Officer Jessica Roberts.

## III.   Compliance and Progress

Ms. Roberts heard the Initial Permanency Review on September 29, 2014. Counsel for all parties appeared and Father participated by phone. At that time, both parents remained incarcerated. Because the parents could not undergo services while incarcerated out of state, Ms. Roberts found no compliance with the permanency plan and no progress towards alleviating the circumstances which necessitated the original placement for either parent. Ms. Roberts ordered the primary placement goal to be a return of D.P. to his parents, with a concurrent goal

7

of adoption. Ms. Roberts continued the ordered services and visitation from the Order of Adjudication. She indicated that both parents were being held in West Virginia for their charges there, and that Mother was to be incarcerated at the Washington County Correctional Facility upon her release from incarceration in West Virginia due to a probation violation. Ms. Roberts indicated that D.P. was doing well in his grandmother's care.

Ms. Roberts held a Permanency Review Hearing on December 29, 2014. Counsel for all parties appeared and Mother participated by telephone. D.P. remained in the care of P. P. Both parents remained incarcerated. Because of their incarceration, Ms. Roberts found that the parents had not complied with the permanency plan and that they had made no progress in alleviating the circumstances which necessitated the original placement.

Ms. Roberts indicated that the parents were awaiting trial on charges of endangering the welfare of a minor child, and that they did call D.P. when they were able to. Ms. Roberts scheduled a further Permanency Review hearing for March 23, 2015.

Counsel for all parties appeared on March 23, 2015. Mother remained incarcerated in the Washington County Correctional Facility, but Father was released from incarceration in West Virginia on January 11, 2015.

8

Ms. Roberts found no compliance and no progress for Mother, due to her continued incarceration. She indicated that Mother had an impending hearing that could result in her imminent release. She found substantial compliance and progress for Father, indicating that he had taken part in his ordered drug and alcohol evaluation and was taking part in twice-weekly outpatient treatment. At that time, Father was no longer taking Suboxone, a treatment for opiate withdrawal, was attending Narcotics Anonymous meetings, and had tested negative on all Agency-ordered drug tests. She further found he was taking part in parenting education classes. The primary placement goal at this hearing remained return to parent.

Ms. Roberts modified the parties' visitation with D.P., permitting mother supervised visitation at the Washington County Correctional Facility and Father liberal supervised visitation in P.P.'s home. She retained all previously ordered services, and scheduled a hearing for June 15, 2015.

The Agency filed its Petition to Involuntarily Terminate the rights of both Mother and Father on February 11, 2015. The Court held a Hearing on the Agency's petition on May 27, 2015.

## Appellate Standard of Review

In an appeal from an order terminating parental rights, the appellate court is limited to determining whether the decision of the trial court is supported by

9

competent evidence. *In the Interest of S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005), appeal denied, 586 Pa. 751, 892 A.2d 824 (2005) (quoting *In re C.S.*, 761 A.2d 1197, 1199 (Pa. Super. 2000)). "[The appellate court is] bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence." *In re M.G.*, 855 A.2d 68, 73 (Pa. Super. 2004) (quoting *In re Diaz*, 447 Pa. Super. 327, 669 A.2d 372, 375 (1995)). The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony. *Id.* at 73–74; *In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa. Super. 2002). In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. *In re M.G.*, 855 A.2d at 73–74. When the trial court's findings are supported by competent evidence of record, [the appellate court] will affirm "even if the record could also support an opposite result." *In the Interest of S.H.*, 879 A.2d at 806. Absent an abuse of discretion, an error of law, or insufficient evidentiary support, the trial court's termination order must stand. *In re C.M.S.*, 884 A.2d 1284, 1286 (Pa. Super. 2005).

### Grounds for Termination

The party seeking termination of parental rights must prove by clear and convincing evidence that the parents' conduct satisfies the statutory grounds for termination. *In re Adoption of C.D.R.*, 111 A.3d 1212 (Pa. Super. 2015). The Court

10

must examine the individual circumstances of each and every case and consider all explanations offered by the parent(s) to determine if the evidence in light of the totality of the circumstances clearly warrants termination. *In re J.L.C.*, 837 A.2d 1247 (Pa. Super. 2003).

The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children. A parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and may properly have his or her rights terminated. *In re K.Z.S.*, 946 A.2d 753 (Pa. Super. 2003), citing *In re B.L.L*, 787 A.2d 1007 (Pa. Super. 2001).

The Agency requested the Court to terminate the parental rights of the parents pursuant to Subsections 1, 2, and 5 of chapter 2511 of the Adoption Act, enumerated below:

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement

11

of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(1), (2), and (5).

Pennsylvania appellate courts have observed that there is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. A parental obligation is a positive duty which requires affirmative performance. This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child. *In re J.T.*, 983 A.2d 771 (Pa. Super. 2009), citing *In re Burns*, 474 Pa. 615, 379 A.2d 535, 540 (1977).

Pursuant to Subsection (a)(1), the Court must determine if the Agency established by clear and convincing evidence that for at least the six months prior to the filing of the termination petition, Mother and Father failed to perform their parental duties or evidenced settled purposes to relinquish their parental rights. § 2511(a)(1), see also *In re Adoption of R.J.S.*, 901 A.2d 502 (Pa. Super. 2006). Furthermore, in examining the parent's conduct, the court must look not only to the six (6) months before the petition but also examine the totality of the circumstances

12

of the case, including the parent's explanation and overall circumstances. *In re B., N.M.*, 856 A.2d 847 (Pa. Super. 2004), citing *In re D.J.S.*, 737 A.2d 283, 286 (Pa. Super. 1999).

"[A] parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties." *In re Adoption of S.P.*, 616 Pa. 309, 47 A.3d 817 (Pa. 2012), citing *Adoption of J.J.*, 511 Pa. 590, 515 A.2d 883, 891 (Pa. 1986). While parental incarceration is not a litmus test for termination, it can be determinative of the question of whether a parent is incapable of providing essential parental care, control, or subsistence and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2). *In re Adoption of S.P.*, 616 Pa. 309, 332, 47 A.3d 817, 830 (2012).

A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. *In re B., N.M.*, 856 A.2d at 855, citing *In re C.M.S.*, 832 A.2d 457, 462 (Pa. Super. 2003).

Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the

13

child with his or her physical and emotional needs. *In re B., N.M.*, 856 A.2d 847, 855, citing *In re D.J.S.*, 737 A.2d 283, 286 (Pa. Super. 1999).

Agency Caseworker Tiffany Lindsay, Paternal Grandmother P. P. , Try-Again Homes Caseworker Bradley Poland, and Father testified at the termination hearing.

Ms. Lindsay credibly testified that after both parents were incarcerated in West Virginia, their contact with D.P. was limited. Credible testimony indicated that Mother sent no cards or letters to D.P. The parents "sporadically" called D.P. when they had "money on the books." According to Ms. Lindsay, D.P. would get upset when talking with his father. Furthermore, from the time of their incarceration to the date of the hearing, neither Mother nor Father provided financial support for D.P.

Bradley Poland, a Try Again Homes caseworker, testified regarding the interaction of each parent with D.P. Mr. Poland observed and supervised each parent with D.P. With regard to Mother, Mr. Poland testified that D.P. appeared to like the visits, though D.P. would not discuss the visits. In contrast, D.P. always mentioned his visits with his father and was excited to see his father. Father credibly testified that when he visits D.P. in the home of P.P. , he will wait until D.P. falls asleep to leave so as not to upset D.P. by his departure.

14

Ms. Lindsay stated that D.P. needs permanency and his interests are best served by termination and adoption by his paternal grandmother. Ms. Lindsay expressed sincere concern that if D.P. were returned to his parents he would encounter difficulties due to the unhealthy relationship Mother and Father have. Father corroborated this testimony and indicated "Me and [Mother] can't be together again."

In 2014, both Mother and Father pleaded guilty to charges relating to child endangerment in Marion County, West Virginia. At the time of the hearing, Father indicated he was participating in drug and alcohol counseling, a 12 step program, mental health treatment, and grief counseling concerning the loss of his daughter. He described long-term use of Oxycontin dating back to 1999. He admitted to abusing Xanax.

Mother remained incarcerated and had not begun services in compliance with the permanency plan. On March 25, 2015, the Honorable Valarie Costanzo sentenced Mother to a total of three (3) to twelve (12) months at the Washington County Correctional Facility at docket numbers CP-63-CR-2282-2013 and CP-63-CR-113-2013. This term was imposed consecutively to the balance of a prior sentence for driving on a suspended license that she was serving on probation when she was arrested in West Virginia. Mother testified that she could be released as early as July 2015 and as late as June 2016.

15

At the time of the termination hearing, D.P. had been in an out of home placement for twenty-two (22) of the last thirty-two (32) months. Mother and Father were both incarcerated for over six months preceding the filing of the petition for termination. Father had been released from incarceration at the time of the hearing, but was still taking part in services necessary to remedy the conditions that led to placement. Even where a parent makes earnest efforts, the court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. *In re Adoption of R.J.S.* 901 A.2d 502, 513 (Pa. Super. 2006).

Mother has made little progress since the placement of the child in 2012. She was ordered to undergo a drug and alcohol evaluation and to follow all recommended treatment as part of the disposition of the first merit hearing in 2012. When D.P. was returned to Father in 2014, the Court ordered Father to have no contact with Mother while D.P. was in his custody. At the time of termination of court supervision in June 2014, Mother was still undergoing treatment for drug use. She has made no progress at alleviating the same circumstances since the second placement.

Similar conditions were the cause of placement in 2012. D.P. was returned to Father in 2014 after being in placement for eleven months. However, he was to be placed again ten months after return and two months after the termination of

16

court supervision. The conditions that twice necessitated the placement of D.P. continue to exist, and no reliable or persuasive evidence was presented demonstrating that these conditions will be remedied by either parent within a reasonable period of time. The Agency proved by clear and convincing evidence that grounds for termination existed pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), and (5).

## Bond

Initially, the focus is on the conduct of the parent. Only when the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to 23 Pa.C.S.A. § 2511(b): Determination of the needs and welfare of the child under the standard of best interests of the child. *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007). In determining if termination best meets the needs of the child, the Court must examine the nature and strength of the parent-child bond and the effect of the severance of that bond. *In re C.M.S.*, 884 A.2d 1284 (Pa. Super. 2005).

Attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy, and the Court must weigh that injury against the damage that bond may cause if left intact. *In re T.S.M.*, 71 A.3d at 269.

17

The law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. *In re T.S.M.*, 620 Pa. 602, 71 A.3d 251 (Pa. 2013), citing *In re R.J.T.*, 608 Pa. 9, 9 A.3d 1179 (Pa. 2010).

The credible testimony provided by Mrs. Lindsay, ? . ?. , and Father indicated that a bond exists between D.P. and his Father that can be beneficial. However, Father has not maintained a safe and stable home, as evidenced by D.P.'s necessary placement for twenty-two (22) of the last thirty-two (32) months, and his drug treatment is not complete. A child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting. *In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa. Super. 2003).

Ms. Lindsay testified that D.P. has a bond with both of his parents. Ms. Lindsay indicated that such bond will continue because P .P. is committed to permitting contact between D.P. and his birth parents.

Ms. Lindsay testified that D.P. is doing well in the home of P. P. She testified that P. P. 'S home is now "home" for D.P. Furthermore, P. P. is a pre-adoptive placement resource who is also willing to serve as a permanent legal custodian. Mrs. Lindsay also indicated that P . P. is willing to enter into a voluntary agreement for continuing contact with both parents pursuant to 23 Pa.C.S.A. § 2731 et. seq.

18

P.P. credibly indicated to the court that she was willing to permit ongoing contact between D.P. and his parents, but would not permit Mother to be in her home because Mother is "violent." Specifically, Mother assaulted P.P. and Mother burned Father's vehicle. Mother herself admitted to burning Father's vehicle approximately "two years ago."

P.P.'s willingness to permit future contact was a factor the Court considered in determining if termination met the best interests of D.P. The effect of the severance of the parent-child bond will not be as severe because of Paternal Grandmother's credible assurance that she would permit contact between D.P. and his parents. The severance of the legal bond between parent and child does not inherently necessitate ending any relationship between parent and child. P.P. credibly testified that she would enter into a post-adoption agreement. For these reasons, the Court found that severing the bond between D.P. and Father would not cause irreparable harm to D.P. See *In re C.L.*, CP-63-OC-2010-802 (Pa.Com.Pl. 2010), aff'd at 32 A.2d 837.

At the hearing, Mother remained incapacitated, and the Court found that there is not a possibility she can remedy the circumstances that necessitated placement in the foreseeable future. D.P. was initially returned to his Father alone, and Mother was permitted only supervised visitation. She has displayed no compliance with court-ordered services and has made no progress to alleviate the

19

circumstances that necessitated placement. Testimony indicated that mother's contact with D.P. consisted of infrequent phone calls and mailed gifts of candy. On this basis, the Court found that a beneficial bond did not exist between Mother and D.P., and thus severing the bond would not cause harm to D.P.

For the above reasons, the Court found that termination was in the best interest of D.P.

## Conclusion

As both parents have not alleviated the circumstances that twice necessitated placement, requiring this case to continue with the goal of reunification gives rise to the real possibility that D.P. may end up placed in kinship or foster care three times in as many years. The Agency met its burden by clear and convincing evidence, and the credible evidence indicated that it was in the best interests of D.P. to have the parent-child bond terminated. To deny the Agency's meritorious petition would be to unnecessarily delay permanency for D.P. The Court appropriately terminated the rights of both parents. As such, this Court's order should be affirmed.

BY THE COURT

Michael J. Lucas, Judge